

FILED ✓   LODGED
RECEIVED   COPY

AUG 27 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

Dr. Nima Ghadimi, Movant Pro Se
5111 N. Scottsdale Road, Suite 143
Scottsdale, AZ 85250
Tel: (480) 620-7210
Email: nimaghadimi69@gmail.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

DR. NIMA GHADIMI, an individual,

        Plaintiff,

v.

ARIZONA BANK & TRUST, a banking
corporation; CADLES CAPITAL, LLC,
(successor to AZBT); JAMES E. CROSS, in
his individual capacity; and DOES 1-20,
inclusive,

        Defendants.

Case No. CV-25-3106-PHX-DJH

---

## COMPLAINT FOR VIOLATIONS OF FEDERAL CIVIL RIGHTS, RICO, AND STATE LAW

[Jury Trial Demanded]

## I. INTRODUCTION

1. This action arises from a coordinated scheme between Arizona Bank & Trust ("AZBT") and bankruptcy trustee James E. Cross to systematically destroy Dr. Nima Ghadimi's healthcare businesses through abuse of federal bankruptcy authority, constitutional violations, and fraud. The businesses, worth over $180 million based on documented third-party valuations, served over 15,000 vulnerable patients including veterans and disabled individuals during the COVID-19 pandemic.

THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING
TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
AND IS SUBJECT TO REJECTION BY THE COURT.
REFERENCE Civil 7.1(c)(1)
(Rule Number/Section)

2. The human toll of this conspiracy extends far beyond financial losses. When defendants destroyed these healthcare businesses, 15,000 patients—primarily veterans receiving VA benefits, disabled individuals relying on telehealth for mobility challenges, and elderly patients unable to travel during COVID-19—lost access to critical medical care overnight. Two hundred healthcare workers, from physicians to nurses to support staff, lost employment without warning. Hospice families experienced the cruelest disruption: terminally ill patients in their final days had their care teams dissolved, forcing families to scramble for new providers during their darkest hours.

3. The scheme began in April 2022 when AZBT seized $1.2 million in physician payroll funds that HonorHealth had contractually restricted for salary payments during the pandemic. (Ex. F). When Dr. Ghadimi pleaded for release of these funds to pay physicians providing critical care, AZBT's representatives, including attorney Scott Cohen, represented in telephonic communications on April 18, 2022 that the funds would be released if Dr. Ghadimi agreed to file for bankruptcy and accept a trustee. After Dr. Ghadimi complied with these conditions in desperate reliance on AZBT's promise, AZBT breached this agreement and instead coordinated with Cross to destroy the businesses while obtaining enhanced legal protections through the May 6, 2022 Cash Collateral Order. (Ex. B).

4. The scheme escalated through submission of perjured testimony to federal court. When Dr. Ghadimi moved to dismiss United Telehealth Corporation from bankruptcy—a company serving 15,000 patients with no secured debt—Cross needed to manufacture opposition. He submitted Dr. Omid Dilmaghanian's sworn declaration dated September 2, 2022, claiming UTC "owed me $250,000" as a creditor. (Ex. W at pp. 8-9). The subsequently discovered UTC Subscription Agreement dated November

2020 proves Dilmaghanian was actually an equity investor who purchased convertible notes, not a creditor, making his sworn statement demonstrably false. (Ex. Z).

5. While serving as a federally-appointed Chapter 11 Trustee with fiduciary duties to all parties in interest, Cross voluntarily testified in California state court to help AZBT collect from Dr. Ghadimi personally. His sworn declaration dated September 21, 2022 accused Dr. Ghadimi of embezzling "at least $5,000,000" and receiving "approximately $22 million in cash" while committing "perjury" and "gross malfeasance." (Ex. C). Cross made these inflammatory accusations while concealing evidence in his possession showing the businesses had received multiple offers including Charter Health Holdings' $45 million Letter of Intent dated May 7, 2021. (Ex. D).

6. Cross compounded these violations by hiring the debtor entities' counsel of record, Jonathan Ibsen, as his own attorney. This created a cascade of violations: ethical breaches under Arizona Rule of Professional Conduct 1.7 prohibiting representation of adverse interests, deprivation of the entities' due process rights under the Fifth Amendment, and strategic silencing of the only witness who knew the bankruptcy petitions were never properly signed.

7. The complete vindication came on July 17, 2025, when the United States Department of Justice dismissed all False Claims Act allegations against Dr. Ghadimi with prejudice after three years of investigation, including grand jury proceedings and whistleblower testimony. (Ex. E). This dismissal exposed the devastating truth: $180 million in healthcare businesses serving Arizona's most vulnerable populations were destroyed based on fabricated allegations.

## II. PARTIES

8. Plaintiff Dr. Nima Ghadimi is an individual residing in Arizona who founded and operated three healthcare companies over twenty-two years. The Phoenix Business Journal recognized him as a "Healthcare Hero" for innovations in patient care. (Ex. R). City Lifestyle magazine profiled UTC's innovative model of bringing military-grade mobile exam stations directly to patients' homes. (Ex. S). He brings this action seeking redress for the destruction of his businesses, career, and reputation through defendants' coordinated scheme.

9. Defendant Arizona Bank & Trust is an Arizona banking corporation that initiated and coordinated the scheme by seizing restricted funds, making false promises to induce bankruptcy filing, and obtaining preferential treatment through coordination with Cross that included immunity from investigation of their wrongful conduct.

10. Defendant Cadles Capital, LLC is a West Virginia limited liability company that acquired AZBT's position through assignment but did not acquire the personal guarantees necessary to pursue Dr. Ghadimi individually. (Ex. A-1). Despite this fatal defect, Cadles continues pursuing collection based on void claims arising from Cross's retracted fraud allegations.

11. Defendant James E. Cross was the court-appointed Chapter 11 bankruptcy trustee in Case Nos. 2:22-bk-02385-EPB, 2:22-bk-02388-EPB, and 2:22-bk-02409-EPB who systematically abused federal authority by submitting perjured testimony, testifying for a single creditor in violation of neutrality duties, concealing evidence of business value, and violating constitutional rights. He is sued in his individual capacity for acts outside the scope of trustee authority.

4

12. Does 1-20 are professionals and entities whose identities will be clarified through discovery, including BeachFleischman PLLC, Coppersmith Brockelman PLC, Terry A. Dake, and others who participated in extracting $1,571,117.70 from the estates while delivering $25,000 to creditors.

## III. JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as this case arises under the Constitution and laws of the United States including claims under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), for constitutional violations by a federal officer.

14. This Court also has jurisdiction under 28 U.S.C. § 1343 (civil rights jurisdiction) for claims seeking redress for deprivation of constitutional rights under color of federal authority.

15. This Court has jurisdiction under 18 U.S.C. § 1964(c) for the civil RICO claims arising from defendants' pattern of racketeering activity affecting interstate commerce.

16. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over state law claims that form part of the same case or controversy.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District, including AZBT's wrongful seizure of funds, Cross's exercise of federal trustee authority, the systematic destruction of Arizona-based businesses, and the coordination between defendants documented in bankruptcy proceedings filed in this District.

18. The automatic stay under 11 U.S.C. § 362 does not deprive this Court of jurisdiction over claims against non-debtor defendants AZBT and Cadles. *Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989).

19. To the extent any claims against Cross require leave under the Barton doctrine, Plaintiff has sought such leave with hearing set for November 3, 2025, in the bankruptcy court. However, the claims against Cross herein are limited to ultra vires acts outside the scope of estate administration for which leave is not required under Ninth Circuit precedent, including testifying as a witness for a single creditor, making extrajudicial defamatory statements, and converting property for personal retaliatory purposes.

## IV. FACTUAL ALLEGATIONS

### A. Dr. Ghadimi Built a Healthcare Empire Serving Vulnerable Populations

20. Over twenty-two years, Dr. Ghadimi built three successful healthcare companies that collectively generated over $20 million annually in revenue and held documented value exceeding $180 million based on multiple independent valuations and acquisition offers.

21. Scottsdale Physicians Group, PLC ("SPG") operated as the exclusive provider of emergency medicine and hospitalist services under a $40 million contract with HonorHealth, Arizona's largest healthcare system. The contract documentation shows SPG managed critical care services across multiple facilities including Scottsdale Osborn Medical Center, Scottsdale Thompson Peak Medical Center, and Scottsdale Shea Medical Center.

22. SPG Hospice, LLC provided compassionate end-of-life care to terminally ill patients throughout Maricopa County. The company operated profitably with no

debt obligations to AZBT, generating positive cash flow through Medicare and private insurance reimbursements for essential hospice services.

23. United Telehealth Corporation ("UTC") revolutionized healthcare delivery during the COVID-19 pandemic by serving over 15,000 patients through innovative digital health programs. UTC's services proved especially vital for veterans, disabled individuals, and elderly patients who could not safely access in-person care during the pandemic.

24. Dr. Ghadimi owned 100% of all three companies, giving him exclusive authority under Arizona law to make major corporate decisions including whether to file for bankruptcy protection. This ownership structure would prove critical when Cross later attempted to justify his actions based on bankruptcy petitions Dr. Ghadimi never signed or authorized.

**B. No Authorized Bankruptcy Petitions Were Ever Filed**

25. The foundation of defendants' scheme rests on a fundamental fraud: no properly authorized bankruptcy petitions were ever filed for any of the three companies. On April 19, 2022, attorney Jonathan P. Ibsen electronically filed the Chapter 11 petition for SPG Hospice, LLC (Dkt. No. 1, Case No. 2:22-bk-02385-EPB) through the CM/ECF system. This was done without corporate authorization, and each CM/ECF transmission constituted an act of wire fraud under 18 U.S.C. § 1343.

26. Cross's own filing dated September 2, 2022, titled "Trustee's Response in Opposition to Motion to Dismiss," acknowledged Dr. Ghadimi's assertions that he "never saw the Petitions prior to filing," "never reviewed or even verbally approved the Petitions before they were filed," and "There was no Authorized Petition in any of the Bankruptcies." (Ex. W at p. 14). When Cross discovered this jurisdictional defect upon his appointment as trustee in April 2022, he faced a choice: disclose the problem

to the bankruptcy court and the Office of the United States Trustee, or conceal it to proceed with his plans. The evidence shows he chose concealment. On May 2, 2022, Cross demanded retroactive declarations of authority under threat of criminal prosecution, as confirmed in his May 2, 2022 email to counsel (Ex. V). This coercion compounded the fraud. Also on May 2, 2022, Cross summoned Dr. Ghadimi to his former conference room at SPG and demanded he sign retroactive declarations of authority.

27. The coercion occurred under circumstances designed to prevent informed consent. Cross presented documents requiring signature by noon, claiming an "urgent filing requirement." When Dr. Ghadimi requested to consult with an attorney before signing documents purporting to retroactively authorize bankruptcy filings he never approved, Cross denied this request and threatened federal criminal prosecution for "interfering with bankruptcy proceedings." Cross later acknowledged the impropriety of this meeting in his May 2, 2022 email to Dr. Ghadimi's attorney: "I assume you have no problem with me talking to Dr. Ghadimi when Jon Ibsen is present as corporate counsel. If you do, I will not talk to him again without you present." (Ex. V).

28. Rather than curing the jurisdictional defect, Cross's coercion compounded it. After obtaining these signatures under duress, Cross took an extraordinary step to ensure the defect would never surface: he hired Jonathan Ibsen, the very attorney who filed the unauthorized petitions and who served as counsel of record for all three debtor entities, as his own trustee's counsel.

29. This strategic hiring served multiple purposes for Cross's scheme. First, it created attorney-client privilege between Cross and the only witness who could testify about the missing signatures. Second, it deprived the debtor entities of independent counsel required under Local Rule 2090-1 for corporations and LLCs to appear in

federal court. Third, it ensured no entity could challenge Cross's actions or raise jurisdictional objections.

30. Sworn declarations from creditors confirm that no signed bankruptcy petitions ever existed. Attorney Shadman Hosseini, representing creditor Dr. Hamideh Hosseini, declared under penalty of perjury that the bankruptcy filings were unauthorized. (Ex. FF). This evidence from independent third parties corroborates Dr. Ghadimi's consistent position that he never authorized these proceedings.

### C. AZBT's Seizure of Funds and Fraudulent Inducement

31. The immediate crisis that precipitated bankruptcy began in April 2022 during the height of the COVID-19 pandemic. Dr. Ghadimi's physician groups faced extraordinary challenges: treating COVID patients while managing their own health risks, dealing with nationwide PPE shortages, and confronting physician resignations as doctors faced burnout and safety concerns.

32. Dr. Ghadimi approached HonorHealth for emergency assistance, and within one week, HonorHealth's senior leadership, including CEO Thomas Sadvary, approved a $3 million advance to ensure continuity of emergency medical services during the public health crisis. The advance agreement explicitly restricted the initial $1.2 million for physician salary payments, recognizing the critical need to retain doctors during the pandemic. (Ex. F).

33. The funds were deposited into SPG's account at AZBT. However, AZBT immediately seized the entire $1.2 million through a unilateral setoff, claiming various alleged defaults on unrelated loans. This seizure of funds contractually restricted for physician salaries during a pandemic created an immediate crisis: doctors providing emergency care to COVID patients would not be paid.

34. When Dr. Ghadimi desperately contacted AZBT to explain that these were restricted funds meant for physician salaries during a public health emergency, AZBT's representatives, including attorney Scott Cohen, made a specific representation that would prove central to the fraudulent scheme. On April 18, 2022, Cohen telephonically promised that if Dr. Ghadimi caused the companies to file bankruptcy and accept appointment of a trustee, AZBT would release the $1.2 million in restricted HonorHealth payroll funds. This promise was false, as shown when petitions were filed on April 19, 2022 and AZBT refused to release the money.

35. In telephonic communications on or about April 18, 2022, AZBT represented that if Dr. Ghadimi agreed to file bankruptcy and accept appointment of a trustee, the seized funds would be released to pay the physicians.

36. Relying on this promise and facing imminent physician resignations that would have disrupted emergency care during COVID-19, Dr. Ghadimi instructed attorney Ibsen to file bankruptcy. However, after the filings on April 19, 2022, AZBT reneged on its promise. Instead of releasing the funds as promised, AZBT demanded additional concessions including enhanced liens and releases from liability.

37. The May 6, 2022 Cash Collateral Order reveals the quid pro quo nature of the coordination between AZBT and Cross. On April 28, 2022, AZBT, through counsel, lodged an "Agreed Order for Debtor's Emergency and Interim Use of Cash Collateral" (Dkt. No. 35, Case No. 2:22-bk-02385-EPB). On May 6, 2022, the court entered a final Cash Collateral Order (Dkt. No. 56). Each CM/CMF filing and service of these documents furthered the fraudulent scheme. This order provided that AZBT would reverse the $1.2 million setoff, but in exchange received: (a) comprehensive releases from any liability for wrongfully seizing the funds; (b) new super-priority liens on assets of all three companies including UTC, in which AZBT had no prior

security interest; and (c) enhanced protections unavailable through normal commercial lending. Critically, the order states: "The Guarantors are not a party to this Agreed Order." (Ex. B at ¶ 25).

### D. Cross Concealed Evidence of Massive Business Value

38. While Cross repeatedly told the bankruptcy court and creditors that the businesses were "hopelessly insolvent" and had been "insolvent since 2016," he possessed and deliberately concealed multiple independent valuations and offers proving the opposite.

39. Charter Health Holdings, after eight months of due diligence, submitted a formal Letter of Intent dated May 7, 2021—just eleven months before bankruptcy— offering $45 million for SPG. CEO James Wright's cover letter stated the organization was "solid and strong" with excellent growth prospects. The offer was based on verified EBITDA exceeding $4 million, with projected 2022 revenues over $67 million. (Ex. D).

40. Regal Healthcare Capital Partners submitted a written offer in February 2021 valuing SPG at $40 million based on 10x EBITDA multiples standard in healthcare acquisitions. Their analysis included detailed financial modeling showing consistent profitability and growth potential in the post-pandemic healthcare market. (Ex. A, Tab 2).

41. Ardenton Capital offered $28 million for SPG in their written indication of interest dated September 2016—the very year Cross claimed insolvency began. This contemporaneous market valuation from a sophisticated healthcare investor directly contradicts Cross's narrative of a business in distress. (Ex. A, Tab 1).

42. Cross's own financial reports to the court undermine his insolvency claims. His 13-week cash flow report showed the companies generating $10,381,904 in

receipts with over $2.1 million in net profits during bankruptcy administration. The report documented positive cash flow of $534,766 even after paying professional fees, directly contradicting claims of businesses that couldn't sustain operations. (Ex. Y).

43. The cruel irony is that Cross claimed insolvency while simultaneously seeking court approval for $597,893 in employee retention bonuses, arguing the businesses needed to retain key personnel. One cannot logically claim a business is hopelessly insolvent while simultaneously arguing it needs to pay bonuses to retain valuable employees for ongoing operations. (Ex. T).

**E. Cross's Ultra Vires Testimony for AZBT**

44. On September 21, 2022, Cross crossed a bright line that no bankruptcy trustee should cross. On this date, he he voluntarily filed his sworn declaration in the Orange County Superior Court Case No. 30-2021-01203490-CU-BC-CJC, (Ex. C), accusing Dr. Ghadimi of embezzlement. This ultra vires act furthered the enterprise by aiding AZBT's California state court collection action against Dr. Ghadimi personally. (Ex. C).

45. Cross's California declaration contains inflammatory accusations designed to destroy Dr. Ghadimi's credibility and assist AZBT's collection efforts. Cross swore under penalty of perjury that Dr. Ghadimi had embezzled "at least $5,000,000" from the companies, received "approximately $22 million in cash," and committed "perjury" and "gross malfeasance." He claimed Dr. Ghadimi used company funds "to support his personal lifestyle" including purchasing luxury items while doctors went unpaid. (Ex. C).

46. Most egregiously, Cross made these sworn accusations while concealing the Charter Health $45 million offer and other valuations in his possession. A trustee testifying that businesses were insolvent while hiding evidence of $45 million offers

violates every principle of trustee neutrality and fiduciary duty. As the Ninth Circuit held in *In re AFI Holding, Inc.,* 530 F.3d 832, 845 (9th Cir. 2008), trustees owe fiduciary duties to all parties in interest and must maintain strict neutrality.

47. Cross's testimony for AZBT was not an isolated incident but part of a coordinated strategy. Evidence demonstrates Cross entered into a joint collection agreement with AZBT whereby AZBT would retain 70% of any recovery from Dr. Ghadimi personally while the estate would receive only 30%. (Ex. P). This financial alignment explains Cross's willingness to violate trustee neutrality: he had a direct financial incentive to help AZBT collect from Dr. Ghadimi.

### F. The Dilmaghanian Perjury and Quid Pro Quo

48. The most blatant example of Cross's willingness to use false evidence emerged when Dr. Ghadimi moved to dismiss UTC from bankruptcy. UTC had no secured debt, was serving 15,000 vulnerable patients during COVID-19, and could have continued operations outside bankruptcy. Cross needed to block this dismissal to maintain control over all three companies.

49. Cross's solution was to submit a declaration from Dr. Omid Dilmaghanian dated September 2, 2022, swearing under penalty of perjury that UTC "owed me $250,000" as a creditor. (Ex. W at pp. 8-9). On September 2, 2022, Cross filed through CM/ECF Dr. Dilmaghanian's false declaration (Ex. W, pp. 8-9) asserting a $250,000 debt. This constituted wire fraud because it transmitted materially false statements across interstate networks. Based on this declaration, the bankruptcy court denied UTC's dismissal, finding that creditor opposition justified continued administration.

50. The subsequently discovered UTC Subscription Agreement dated November 2020 exposes this as deliberate perjury. The agreement clearly shows

Dilmaghanian purchased convertible notes as an equity investment, not a loan. The document explicitly uses investment terminology, provides for equity conversion, and contains none of the repayment terms associated with debt. Dilmaghanian's sworn statement that UTC "owed" him money was demonstrably false. (Ex. Z).

51. Cross knew or should have known this declaration was false. As trustee, he had access to UTC's books and records, including the subscription agreement. Any reasonable investigation would have revealed Dilmaghanian's true status as an investor. Cross's submission of this perjured testimony to a federal court constitutes subornation of perjury and fraud on the court.

52. The quid pro quo for this false testimony emerged immediately. After the court relied on Dilmaghanian's declaration to deny UTC's dismissal, Cross orchestrated the transfer of SPG's valuable HonorHealth contracts and operations to a group that included Dilmaghanian. No competitive bidding occurred. No court approval was sought under 11 U.S.C. § 363. No consideration was paid to the estate. The message was clear: provide false testimony to keep UTC in bankruptcy, receive a $40 million business in return.

### G. The Pattern of Racketeering Activity

53. Defendants' scheme constitutes a pattern of racketeering activity affecting interstate commerce. The enterprise consisted of AZBT (later Cadles), Cross, and associated professionals operating through systematic abuse of federal bankruptcy processes for mutual enrichment at Dr. Ghadimi's expense.

54. The pattern included multiple predicate acts of wire fraud under 18 U.S.C. § 1343. Cross electronically filed false bankruptcy petitions through the CM/ECF system, knowing they lacked proper authorization. Each electronic transmission of these fraudulent documents across interstate networks to federal court servers

constitutes wire fraud. Cross electronically filed Dilmaghanian's perjured declaration through CM/ECF, transmitting false evidence across state lines. AZBT's electronic communications containing false promises to release seized funds if Dr. Ghadimi filed bankruptcy constitute wire fraud across interstate banking networks.

55. The pattern included mail fraud under 18 U.S.C. § 1341 through service of fraudulent documents via U.S. Mail to parties in multiple states. Cross served notices containing false valuations and fabricated allegations through certified mail to creditors nationwide, each mailing furthering the scheme to conceal business value while extracting excessive fees.

56. The scheme included obstruction of justice through Cross's strategic hiring of the debtors' counsel to create attorney-client privilege and silence potential witnesses. This deliberate action prevented disclosure of jurisdictional defects and enabled submission of false evidence without challenge.

57. The enterprise's profitability is documented in court-approved fee applications. Cross personally extracted $678,866.07 while his professionals took an additional $892,251.63, totaling $1,571,117.70. This represents a 63:1 ratio compared to the $25,000 delivered to creditors, demonstrating that professional enrichment, not creditor recovery, was the enterprise's true purpose. (Ex. Q, N, X).

58. The professional fee extraction reveals the enterprise's true criminal purpose. BeachFleischman PLLC extracted $430,261 for "accounting services" that concealed rather than revealed the businesses' true value—they never disclosed the Charter Health offer in any report. Coppersmith Brockelman PLC took $188,960 while listed as "healthcare personnel" though they provided only legal services that facilitated the businesses' destruction. Terry A. Dake collected $111,742.25 for defending Cross's indefensible conduct. Each professional's outsized fees—compared

to the $25,000 creditors received—demonstrates their knowing participation in the criminal enterprise. (Ex. Q).

### H. Cross's Public Defamation Campaign

59. Beginning in summer 2022, Cross launched a public campaign to destroy Dr. Ghadimi's reputation through false allegations disseminated beyond court filings. Cross's trustee reports, distributed to creditors and media, accused Dr. Ghadimi of embezzling $22 million and defrauding physician investors. These allegations were reported by Phoenix Business Journal, AZ Central, and other media outlets, destroying the reputation Dr. Ghadimi built over twenty-two years. (Ex. K).

60. Between June and December 2022, Cross electronically filed and mailed trustee reports containing false allegations, including those relied upon by Mercy Care. On August 18, 2022, Vice President of Contracting at Mercy Care, Christi Lundeen, confirmed reliance on one such trustee report in deciding to cancel a contract meeting. (Ex. H). Each CM/ECF transmission and mailing of these reports constituted mail and wire fraud.

61. The human impact of Cross's defamation is documented in text messages from Ms. Lundeen. On August 18, 2022, Lundeen explicitly stated: "We've seen the trustees report. Unfortunately given what we have seen it's likely the meeting will be cancelled." When Dr. Ghadimi desperately tried to explain, swearing on his 8-year-old daughter that the allegations were false, Lundeen responded that it was "really hard to look past keeping your mom on the payroll, paying all of your personal bills out of the company account, buying a Rolls Royce and a house in Newport Beach, while your doctors weren't getting paid." (Ex. H).

62. These were Cross's exact false characterizations, showing how his defamation directly prevented Dr. Ghadimi from rebuilding his medical practice. The

15-year relationship with Mercy Care that had generated over $15 million in documented Medicaid savings was destroyed by Cross's lies. The cruelty of Cross's false allegations becomes starkly clear when contrasted with Dr. Ghadimi's actual circumstances. On June 3, 2022, while Cross was publicly accusing him of embezzling $22 million and living luxuriously, Dr. Ghadimi sent a desperate email to counsel revealing the truth: "I have been evicted from my apartment for non-payment. I am selling personal belongings to buy food. My wife and 8-year-old daughter are suffering. Please, I am begging—let me see even a few patients remotely, as a 'ghost,' just to feed my family. I will take any amount, work any hours. I cannot let my child go hungry." (Ex. I).

63. On November 27, 2023, facing litigation over his conduct, Cross signed a press release admitting "any and all claims involving financial improprieties have been fully and completely resolved." This retraction effectively admitted that three years of fraud allegations were baseless. Under the doctrine of judicial estoppel established in *New Hampshire v. Maine,* 532 U.S. 742 (2001), Cross cannot now deny that his fraud allegations were false. (Ex. J).

**I. Systematic Constitutional Violations**

64. Cross violated Dr. Ghadimi's Fifth Amendment due process rights through systematic exclusion from proceedings affecting his property interests. As 100% owner of all three companies, Dr. Ghadimi held protected property interests requiring notice and opportunity to be heard before deprivation.

65. Cross deliberately frustrated these rights by serving all notices at addresses he knew were incorrect. When Dr. Ghadimi's attorney withdrew on May 4, 2022, he filed a notice stating: "All future pleadings and notices should be sent directly to:

Nima Ghadimi and Yalda Fallahi, 11458 E. Gamble Lane, Scottsdale, AZ 85262". Yet Cross continued serving notices at 8750 E. San Pedro Drive, an address Dr. Ghadimi left in 2005—twenty years ago—and 10 Kingsport Drive, Newport Coast, the very property in foreclosure that Cross knew was abandoned.

66. Cross compounded these violations by depriving the debtor entities of their right to counsel. By hiring their attorney while keeping him listed as "counsel for debtor" on the docket, Cross ensured the entities had no voice to challenge false claims, object to improvident sales, or raise jurisdictional defects. This calculated deprivation of counsel violates fundamental due process guarantees.

67. Cross even stooped to petty retaliation by converting Dr. Ghadimi's personal property. Insurance payments totaling $838.04 made by Humana directly to "Nima Ghadimi MD" for medical services rendered under his personal provider credentials were intercepted by Cross. When Dr. Ghadimi demanded return of his personal funds, Cross admitted the taking was "inadvertent" but attempted to justify retention through unauthorized offset.

68. Specific employees can attest to Cross's pattern of intimidation and false statements. Nick Vondra, UTC's Tech Operations Director, reported being interrogated by Cross, Blue Beckham, and Ibsen in July 2022. They demanded to search his phone for Dr. Ghadimi's contacts and insisted he sign an affidavit against Dr. Ghadimi. When Vondra refused, they physically forced him from the building. (Ex. U).

69. The speed of Cross's retaliation reveals its vindictive nature. On May 24-25, 2022, Cross expressly authorized Dr. Ghadimi through counsel to "get a job and/or start his own company and he won't assert corporate opportunity claims." (Ex. G). Dr. Ghadimi, desperate to support his family, immediately formed Prestige

Medical Practice. Exactly eleven days later, on July 22, 2022, Cross filed an adversary proceeding against both Dr. Ghadimi and the new company, seeking damages for alleged stay violations based on the very conduct Cross had authorized. (Ex. M). Cross personally called Mercy Care executives to poison the relationship, ensuring the new practice would fail. This bait-and-switch—authorize conduct, then sue for it—represents deliberate entrapment designed to prevent Dr. Ghadimi from earning any income to defend himself.

### J. The Void Guaranty Claims

70. Central to this entire scheme is a document that doesn't exist: a personal guaranty signed by Dr. Ghadimi. Despite three years of litigation in Arizona state court (Maricopa County Superior Court Case No. CV 2022-005137), closed discovery, and multiple court orders, Cadles has never produced any personal guaranty. (Ex. A-1).

71. The absence is not for lack of trying. Cadles produced various business loan documents, assignments, and even "lost note affidavits" for the underlying commercial obligations. But no personal guaranty has ever surfaced. Under Arizona's statute of frauds, A.R.S. § 44-101(2), no action may be brought upon a promise to answer for another's debt without a signed writing.

72. Even if a guaranty once existed, it was discharged by the May 6, 2022 Cash Collateral Order that states unequivocally: "The Guarantors are not a party to this Agreed Order". (Ex. B at ¶ 25). This order materially modified the underlying obligations by granting AZBT releases from liability, new super-priority liens worth millions, and fundamental changes to the debt structure—all without guarantor consent. Under Arizona law, such modifications discharge any guarantor obligations. A.R.S. § 47-3605.

### K. The Pending Appeal of the Underlying Judgment

73. The $3.65 million judgment that AZBT and Cadles use as the cornerstone of their collection efforts is itself suspect and currently on appeal to this Court. Dr. Ghadimi v. Cross, Case No. 2:24-cv-01992-PHX-GMS. The bankruptcy court entered summary judgment on October 16, 2023, finding Dr. Ghadimi breached fiduciary duties by transferring company funds to a personal account. (Ex. AA).

74. The appeal, with opening brief filed August 26, 2024, raises fundamental legal errors. The bankruptcy court imposed fiduciary duties that SPG's operating agreement explicitly eliminated under Arizona law. The court failed to consider that Dr. Ghadimi's actions occurred during the COVID-19 emergency when businesses faced extinction and temporary investment of funds was necessary to preserve value.

75. Distribution of Dr. Ghadimi's assets based on a judgment subject to reversal would compound the irreparable harm. If the judgment is reversed—as the strong appellate arguments suggest—recovering funds distributed to entities in multiple jurisdictions becomes virtually impossible.

### L. Immediate and Irreparable Harm

76. Dr. Ghadimi faces foreclosure of his $8 million California residence tomorrow, August 27, 2025. The foreclosure notice confirms Chase Bank will recover approximately $3.5 million as legitimate senior lienholder. Based on property appraisals, surplus proceeds of $3.5-6.5 million will remain after Chase is paid. (Ex. CC).

77. AZBT and Cadles are positioning to seize these surplus proceeds based on their void claims. Without immediate intervention, the last substantial asset remaining after defendants destroyed Dr. Ghadimi's healthcare empire will be stolen to complete their criminal scheme.

78. Cross filed his Final Report and Application for Discharge on June 11, 2025, seeking to escape accountability before his misconduct can be fully adjudicated. His rush toward discharge while Dr. Ghadimi faces homelessness from void claims represents the final act of a scheme that began with false promises and ends with complete destruction. (Ex. Q).

79. Just two days after the DOJ vindicated Dr. Ghadimi on July 17, 2025, his family received threatening text messages warning he would "leave in handcuffs" and face imprisonment. These threats, coming immediately after federal exoneration, demonstrate the vindictive nature of those seeking to complete their theft. (Ex. L).

## V. FIRST CAUSE OF ACTION
### Deprivation of Constitutional Rights Under Color of Federal Law - Bivens Action
### (Against Cross in his individual capacity)

80. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

81. Cross, while acting under color of federal law as a federally-appointed bankruptcy trustee, systematically deprived Dr. Ghadimi of rights secured by the Fifth Amendment to the United States Constitution. This Bivens action seeks damages for constitutional violations by a federal officer acting in his individual capacity outside the scope of his lawful authority.

82. Cross's conduct violated substantive due process by engaging in behavior that "shocks the conscience" under the standard established in *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). When a federal trustee submits perjured testimony he knows to be false to destroy a company serving 15,000 vulnerable patients during a pandemic, testifies for private creditors while concealing $45 million valuations that prove solvency, destroys $180 million in healthcare businesses based

on allegations he later admits were fabricated, deprives entities of required counsel to silence opposition to his scheme, extracts $678,866.07 for himself while delivering $25,000 to creditors, and converts personal property for retaliatory purposes, such conduct represents egregious abuse of federal power that violates fundamental notions of fairness and justice.

83. Cross violated procedural due process by deliberately depriving Dr. Ghadimi of notice and opportunity to be heard. By serving all notices at addresses abandoned twenty years ago despite knowing the correct address, Cross ensured Dr. Ghadimi could not participate in proceedings affecting his property rights. By depriving the debtor entities of independent counsel while maintaining the fiction of representation, Cross violated the most basic tenets of fair judicial proceedings.

84. Cross's coordination with AZBT for mutual commercial benefit violates clearly established federal law requiring trustees to maintain neutrality and act for the benefit of all parties in interest. This conduct eliminates any qualified immunity defense under *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), as no reasonable trustee could believe that testifying for one creditor while concealing evidence of solvency was lawful.

85. The specific ultra vires acts for which Cross has no immunity include: testifying as a witness for AZBT in California state court proceedings where he had no authority as trustee, making defamatory statements to media outlets and third parties outside any judicial proceeding, converting Dr. Ghadimi's personal insurance payments for retaliatory purposes, and depriving the debtor entities of counsel by creating conflicted representation.

86. As a direct and proximate result of Cross's constitutional violations, Dr. Ghadimi suffered destruction of businesses worth over $180 million based on

documented valuations, complete elimination of his medical career and ability to serve patients, loss of his professional reputation built over twenty-two years, and faces imminent homelessness while Cross collected $678,866.07 in fees.

## VI. SECOND CAUSE OF ACTION
### Civil Conspiracy Under Arizona Common Law
### (Against All Defendants)

87. Plaintiff incorporates by reference all preceding allegations.

88. Defendants AZBT, Cross, and Cadles engaged in a civil conspiracy by agreeing to accomplish unlawful objectives through unlawful means. The conspiracy's objectives included destroying Dr. Ghadimi's businesses to eliminate AZBT's collateral obligations while obtaining enhanced collection rights, extracting excessive professional fees through abuse of bankruptcy processes, and completing the theft by seizing Dr. Ghadimi's remaining assets based on void claims.

89. Defendants committed numerous unlawful acts in furtherance of the conspiracy. AZBT wrongfully seized restricted physician payroll funds during a pandemic, made false promises to induce bankruptcy filing knowing they would not be honored, and coordinated with Cross to obtain releases and enhanced liens unavailable through legitimate lending. Cross submitted perjured testimony to federal court, testified for AZBT while concealing evidence of solvency, systematically excluded Dr. Ghadimi from proceedings through deliberate mis-service, and extracted excessive fees while destroying viable businesses. Cadles continues pursuing collection based on a guaranty it cannot produce and claims arising from Cross's retracted fraud allegations.

90. The conspiracy's coordination is evidenced by the timing and nature of defendants' acts. AZBT seized funds then promised release conditional on bankruptcy filing. Once filed, AZBT coordinated with Cross to obtain the May 6 Order granting

comprehensive releases. Cross then testified for AZBT in state court while pursuing joint collection efforts through the 70/30 agreement. (Ex. P). The conspiracy continues with Cadles pursuing Dr. Ghadimi's assets based on the fraudulent foundation AZBT and Cross established.

91. As a direct result of this conspiracy, Dr. Ghadimi suffered damages exceeding $180 million in destroyed business value, lost medical career, and faces loss of his remaining assets. Under Arizona law, all conspirators are jointly and severally liable for all damages caused by the conspiracy.

### VII. THIRD CAUSE OF ACTION
### Violations of RICO - 18 U.S.C. § 1962(c) and (d)
### (Against All Defendants)

92. Plaintiff incorporates by reference all preceding allegations.

93. Defendants conducted and participated in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and conspired to do so in violation of 18 U.S.C. § 1962(d).

94. The enterprise consisted of an association-in-fact including AZBT, Cross, Cadles, and various professionals who coordinated to systematically strip Dr. Ghadimi's assets through abuse of federal bankruptcy processes. Under *Boyle v. United States,* 556 U.S. 938, 946 (2009), this enterprise had a common purpose (asset stripping through bankruptcy abuse), relationships among participants shown through coordinated conduct, and longevity spanning from April 2022 through ongoing collection efforts.

95. Defendants engaged in a pattern of racketeering activity consisting of multiple related predicate acts. The pattern included wire fraud in violation of 18 U.S.C. § 1343 through: (a) Cross's electronic filing via CM/ECF of bankruptcy petitions he knew lacked authorization, with each transmission to federal servers

constituting a separate act; (b) Cross's electronic filing of Dilmaghanian's perjured declaration, transmitting false evidence across state lines; (c) AZBT's interstate electronic communications falsely promising to release seized funds; and (d) transmission of fraudulent valuations and false trustee reports through electronic systems reaching parties nationwide.

96. The pattern included mail fraud in violation of 18 U.S.C. § 1341 through service via U.S. Mail of documents containing false valuations and fabricated allegations to creditors in multiple states, with each mailing constituting a separate predicate act furthering the scheme.

97. The pattern included obstruction of justice through Cross's hiring of debtors' counsel to prevent disclosure of jurisdictional defects and silence opposition to false evidence. This deliberate obstruction enabled the entire scheme to proceed without challenge.

98. The enterprise affected interstate commerce through multiple channels. The scheme destroyed healthcare businesses that served patients across state lines through telehealth services, with UTC alone serving 15,000 patients nationwide. The bankruptcy proceedings themselves operate in interstate commerce, with creditors from multiple states and assets throughout the country. The enterprise utilized interstate banking systems for the wrongful seizure and transfer of funds. The healthcare services disrupted included Medicare and Medicaid programs that operate in interstate commerce.

99. The pattern demonstrates both closed-ended continuity over several years and open-ended continuity through ongoing collection efforts. The related predicate acts all served the common purpose of asset stripping while enriching enterprise members at Dr. Ghadimi's expense.

100. Under *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 654 (2008), Dr. Ghadimi need not have relied on the fraudulent misrepresentations to have standing. The racketeering activity directly caused his injuries totaling $238 million in base damages from business destruction ($180 million in documented valuations), lost future earnings from medical practice ($50 million over remaining career), and loss of surplus proceeds from foreclosure ($8 million).

101. The enterprise's profitability is documented in court records. Cross extracted $678,866.07 personally while his professionals took $892,251.63, totaling $1,571,117.70—compared to $25,000 for creditors. This 63:1 extraction ratio proves professional enrichment, not legitimate administration, was the enterprise's purpose.

102. The predicate acts of racketeering include, but are not limited to, the following acts, each of which is pleaded with particularity.

| Date | Actor(s) | Docket/Exhibit Ref. | Conduct / Allegation | Predicate Act |
|---|---|---|---|---|
| Apr. 18, 2022 | Scott Cohen (AZBT counsel) | Ex. F; Complaint §C | Telephonic promise to release $1.2M if bankruptcy filed; fraudulent inducement | Wire fraud (18 U.S.C. § 1343) |
| Apr. 19, 2022 | Jonathan Ibsen (for Cross) | Dkt. 1, Case 2:22-bk-02385 | Electronic filing of unauthorized Ch. 11 petitions via CM/ECF | Wire fraud |
| Apr. 28, 2022 | AZBT / Cross | Dkt. 35 (Agreed Cash Collateral Order) | Lodged cash collateral order granting AZBT releases and liens | Wire fraud |
| May 2, 2022 | James Cross | Ex. V (email) | Coerced retroactive declarations of authority under threat of prosecution | Extortion / obstruction of justice |
| May 6, 2022 | James Cross | Dkt. 56 (Final Cash Collateral Order) | Filed order granting AZBT enhanced protections, concealing scheme | Wire fraud |
| Jun–Dec 2022 | James Cross | Trustee Reports | Circulated false insolvency reports via CM/ECF & mail to creditors, echoed in media | Mail/wire fraud |

| Date | Actor(s) | Docket/Exhibit Ref. | Conduct / Allegation | Predicate Act |
|------|----------|---------------------|---------------------|---------------|
| Aug. 18, 2022 | James Cross | Ex. H (Mercy Care texts) | False trustee report led Mercy Care to cancel meeting | Mail/wire fraud |
| Sept. 2, 2022 | James Cross / Omid Dilmaghanian | Ex. W (pp. 8–9) | Filed perjured declaration falsely asserting $250K debt | Wire fraud, perjury, subornation |
| Sept. 21, 2022 | James Cross | Ex. C | Sworn declaration in California state court accusing Dr. Ghadimi of embezzlement | Mail/wire fraud, extortion, obstruction |

103. Under 18 U.S.C. § 1964(c), Dr. Ghadimi is entitled to treble damages of $714 million ($238 million × 3) plus attorneys' fees and costs.

## VIII. FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty Under Arizona Common Law
### (Against Cross)

104. Plaintiff incorporates by reference all preceding allegations.

105. As court-appointed trustee under 11 U.S.C. § 1104, Cross owed the highest fiduciary duties to all parties in interest, including Dr. Ghadimi as 100% equity owner of the debtor entities. These duties included loyalty, care, good faith, candor, and impartiality.

106. Cross systematically breached every fiduciary duty owed. He breached his duty of loyalty by aligning with AZBT for mutual benefit rather than estate maximization, entering a 70/30 collection sharing agreement that subordinated estate interests to AZBT's goals, and testifying as AZBT's witness in state court proceedings against the estate's interests.

107. Cross breached his duty of care by suppressing evidence of business value exceeding $100 million while claiming insolvency, accepting false creditor claims including Dilmaghanian's perjured declaration, liquidating profitable

businesses generating $10 million in receipts for nominal consideration, and failing to investigate or challenge AZBT's wrongful seizure of restricted funds.

108. Cross breached his duty of candor by concealing jurisdictional defects from the court, submitting perjured testimony he knew to be false, hiding evidence of business solvency while seeking liquidation, and making false public statements about alleged fraud later retracted.

109. Cross breached his duty of good faith by pursuing a predetermined agenda to destroy the businesses regardless of value, making fraud allegations he knew were baseless to justify his actions, and converting property for retaliatory purposes when challenged.

110. Most fundamentally, Cross breached his duty of impartiality by creating an insurmountable conflict through retention of debtors' counsel. This deprived the entities whose interests he was duty-bound to protect of their only advocate, ensuring no independent voice could challenge his decisions or expose his misconduct. A trustee who silences opposition by co-opting their counsel abandons the essence of fiduciary duty.

111. Cross accepted $678,866.07 in compensation for services that consisted primarily of destroying rather than preserving the assets he was appointed to protect. Under Arizona law, a fiduciary who breaches his duties must disgorge all compensation received.

112. As a direct and proximate result of Cross's breaches, Dr. Ghadimi suffered complete destruction of businesses exceeding $180 million in value, elimination of his medical career and ability to serve patients, and ongoing harm from continued use of false allegations in collection proceedings.

## IX. FIFTH CAUSE OF ACTION
### Fraud and Fraudulent Inducement Under Arizona Common Law
### (Against Cross and AZBT)

113. Plaintiff incorporates by reference all preceding allegations.

114. Defendants made multiple false representations of material fact with intent to deceive and induce reliance, causing damage to Dr. Ghadimi.

115. AZBT, through its representatives including attorney Scott Cohen, falsely represented in April 2022 that if Dr. Ghadimi agreed to file bankruptcy and accept a trustee, the $1.2 million in seized physician payroll funds would be released. This representation was false when made, as AZBT never intended to release the funds without obtaining additional concessions including releases and enhanced liens.

116. Cross falsely represented to the bankruptcy court on numerous occasions that the debtor businesses were "hopelessly insolvent" and had been "insolvent since 2016," while possessing and concealing Charter Health's $45 million offer, Regal Healthcare's $40 million valuation, and his own financial reports showing $10 million in receipts with profits exceeding $2 million.

117. Cross falsely accused Dr. Ghadimi of embezzling $22 million, defrauding physician investors, and committing Medicare fraud through court filings and public statements. These representations were knowingly false, as evidenced by Cross's November 2023 retraction admitting "any and all claims involving financial improprieties have been fully and completely resolved."

118. Defendants knew their representations were false when made. AZBT never intended to release funds without extracting additional concessions. Cross possessed the valuation evidence he concealed and knew the fraud allegations lacked any factual basis.

119. Dr. Ghadimi reasonably relied on AZBT's promise when agreeing to bankruptcy, facing the crisis of unpaid physicians during COVID-19. Courts and creditors relied on Cross's false representations about insolvency and fraud when approving liquidation of viable businesses.

120. The fraud directly caused damages exceeding $180 million in destroyed business value, lost career earnings, and ongoing collection efforts based on void claims arising from the fraudulent scheme.

## X. SIXTH CAUSE OF ACTION
### Defamation Per Se Under Arizona Common Law
### (Against Cross)

121. Plaintiff incorporates by reference all preceding allegations.

122. Cross published false and defamatory statements accusing Dr. Ghadimi of crimes involving moral turpitude, including embezzlement of $22 million, fraud against physician investors, Medicare fraud, and perjury. These statements were published through extra-judicial channels including media interviews, creditor communications beyond required court notices, and discussions with third parties like Mercy Care executives.

123. Under Arizona law, false accusations of crimes involving moral turpitude constitute defamation per se for which damages are presumed. *Modla v. Parker,* 495 P.2d 494, 495 n.1 (Ariz. Ct. App. 1972). Accusations that a physician embezzled millions while patients went untreated attack both personal character and professional fitness.

124. The statements were demonstrably false, as evidenced by Cross's November 2023 retraction admitting all financial impropriety claims were "fully and completely resolved" and the DOJ's July 2025 dismissal of all fraud allegations after three years of investigation.

125. Cross acted with actual malice, knowing the statements were false or with reckless disregard for their truth. He possessed evidence of $45 million business offers while claiming insolvency and made fraud accusations without any factual investigation or basis.

126. The defamation destroyed Dr. Ghadimi's medical career, with healthcare organizations explicitly refusing to work with him after "seeing the trustee's report." Mercy Care's 15-year relationship generating millions in Medicaid savings ended specifically because of Cross's false allegations.

127. The ongoing republication of these false statements in collection proceedings creates fresh injuries within the statute of limitations. Each use of Cross's defamatory statements to justify collection efforts constitutes a new publication causing new harm.

## XI. SEVENTH CAUSE OF ACTION
### Conversion Under Arizona Common Law
### (Against Cross and AZBT)

128. Plaintiff incorporates by reference all preceding allegations.

129. Defendants exercised wrongful dominion over property belonging to Dr. Ghadimi with intent to permanently deprive him of its use and benefit.

130. AZBT converted $1.2 million in funds contractually restricted for physician payroll payments during the COVID-19 pandemic. AZBT knew these funds were designated for third-party salary obligations based on HonorHealth's explicit restrictions, yet seized them for its own benefit.

131. Despite Dr. Ghadimi's demands for return and AZBT's promise to release the funds upon bankruptcy filing, they were never returned to their intended purpose. Instead, AZBT used the seized funds as leverage to extract releases and enhanced liens through the May 6 Order.

132. Cross converted $838.04 in insurance payments made by Humana directly to "Nima Ghadimi MD" for medical services rendered under his personal provider credentials. These payments were Dr. Ghadimi's personal property for his individual medical services, not estate property.

133. When Dr. Ghadimi demanded return of his personal insurance payments, Cross's attorney admitted the taking was "inadvertent." However, Cross attempted to justify retention through claimed offset rights he did not possess over personal property. Cross ultimately issued a replacement check with a banking hold preventing negotiation, demonstrating intent to permanently deprive.

134. The conversion of both restricted payroll funds and personal insurance payments caused direct damages and contributed to the broader scheme of business destruction through deprivation of operating capital and retaliation against Dr. Ghadimi for asserting his rights.

## XII. EIGHTH CAUSE OF ACTION
### Declaratory Relief Under 28 U.S.C. § 2201
### Void Guaranty Under Arizona Law
### (Against Cadles)

135. Plaintiff incorporates by reference all preceding allegations.

136. An actual controversy exists between Dr. Ghadimi and Cadles regarding the existence and enforceability of any personal guaranty obligations. Cadles asserts it can collect millions from Dr. Ghadimi personally based on alleged guaranty obligations, while Dr. Ghadimi contends no valid guaranty exists.

137. Despite three years of litigation in Arizona state court (Maricopa County Superior Court Case No. CV 2022-005137) with discovery now closed and trial set for November 2025, Cadles has failed to produce any signed personal guaranty document. The absence of this fundamental document after extensive discovery demonstrates no enforceable guaranty exists.

138. Arizona's statute of frauds, A.R.S. § 44-101(2), provides that no action may be brought "upon a promise to answer for the debt, default, or miscarriage of another" unless the promise is in writing and signed by the party to be charged. Without a signed guaranty, Cadles has no claim against Dr. Ghadimi for corporate debts.

139. Even if a guaranty once existed, it was discharged by material modifications made without guarantor consent. The May 6, 2022 Cash Collateral Order explicitly states: "The Guarantors are not a party to this Agreed Order," yet proceeded to grant AZBT comprehensive releases from liability, new super-priority liens worth millions, and fundamental alterations to the debt structure. (Ex. B at ¶ 25).

140. Under Arizona law codified at A.R.S. § 47-3605 and established in cases like *3550 Stevens Creek Assocs. v. Barclays Bank,* 915 F.2d 1355, 1358-59 (9th Cir. 1990), material modifications to underlying obligations without guarantor consent discharge the guarantor from liability. The explicit exclusion of guarantors from an order modifying their obligations presents the clearest possible case for discharge.

141. Dr. Ghadimi is entitled to a declaration that no valid personal guaranty exists and that any guaranty that may have existed was discharged by material modifications made without his consent. Such declaration is necessary to prevent Cadles from seizing surplus proceeds from the imminent foreclosure based on void claims.

## XIII. EMERGENCY RELIEF REQUIRED

142. Dr. Ghadimi faces irreparable harm requiring immediate judicial intervention. His California residence faces foreclosure tomorrow, August 27, 2025, with surplus proceeds of approximately $3.5-6.5 million at risk of seizure by defendants based on void claims.

143. Without immediate relief, defendants will complete their criminal scheme: having destroyed $180 million in healthcare businesses through fraud and bankruptcy abuse, they now position to seize Dr. Ghadimi's last substantial asset based on a guaranty that doesn't exist and claims arising from retracted allegations.

144. The Court's intervention is necessary to prevent manifest injustice. Allowing defendants to profit from their coordinated scheme would sanction the use of bankruptcy for racketeering and encourage similar abuse by others who see crime rewarded rather than punished.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Dr. Nima Ghadimi respectfully requests that this Court:

1. IMMEDIATELY, on an emergency ex parte basis if necessary, enter a temporary restraining order before the August 27, 2025 foreclosure directing any trustee or agent conducting the sale to hold all surplus proceeds in trust pending further order of this Court, and enjoining defendants AZBT and Cadles from claiming, receiving, or directing distribution of any such surplus proceeds;

2. Enter declaratory judgment that no valid personal guaranty exists and any alleged guaranty was discharged by material modifications without consent;

3. Award damages against Cross under Bivens for constitutional violations in an amount to be proven at trial but not less than $50 million;

4. Award RICO treble damages of $714 million against all defendants jointly and severally;

5. Award compensatory damages exceeding $180 million against all defendants for the destruction of Plaintiff's businesses;

6. Award punitive damages in an amount sufficient to deter similar conduct;

7. Order disgorgement of all compensation received by Cross totaling $678,866.07;

8. Award costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c) and other applicable law; and

9. Grant such other and further relief as this Court deems just and proper.


**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE**


Respectfully submitted this 26th day of August, 2025.

*/s/ Dr. Nima Ghadimi*
Dr. Nima Ghadimi
Plaintiff Pro Se
5111 N. Scottsdale Road
Scottsdale, AZ 85250
Tel: (480) 716-5998
Email: nimaghadimi69@gmail.com


**VERIFICATION**

I, Dr. Nima Ghadimi, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Complaint and that the factual allegations contained therein are true and correct to the best of my knowledge, information, and belief.

Executed on August 26, 2025, at Scottsdale, Arizona.

*/s/ Dr. Nima Ghadimi*
Dr. Nima Ghadimi
Plaintiff Pro Se