**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Nima Ghadimi,

      Plaintiff,

v.

Arizona Bank & Trust, et al.,

      Defendants.

No. CV-25-03106-PHX-KML

**ORDER**

Plaintiff Nima Ghadimi believes defendants Arizona Bank & Trust ("AZBT") and bankruptcy trustee James E. Cross pursued a "coordinated scheme . . . to systematically destroy [his] healthcare businesses through abuse of federal bankruptcy authority." (Doc. 12 at 1.) In this suit, Ghadimi alleges claims against AZBT, Cadles of West Virginia LLC (AZBT's successor-in-interest), and Cross for deprivation of his constitutional rights, civil conspiracy, civil RICO, breach of fiduciary duty, fraud, defamation, conversion, and declaratory relief. Even viewed in the light most favorable to Ghadimi, neither the operative nor the proposed amended complaint state any claims for relief. Because amendment would be futile, the current complaint is dismissed without leave to amend.

## BACKGROUND

The operative complaint does not present events in chronological order and contains contradictory allegations regarding certain crucial events. The following is a simplified version of the events recounted in the complaint, recited in the light most favorable to Ghadimi.

Over the course of 22 years, Ghadimi "built a healthcare empire serving vulnerable populations." (Doc. 12 at 6.) Ghadimi's empire consisted of three companies: Scottsdale Physicians Group, PLC ("SPG"); SPG Hospice, LLC; and United Telehealth Corporation. (Doc. 12 at 6-7.) At least one of those companies had a contractual relationship with "HonorHealth, Arizona's largest healthcare system." (Doc. 12 at 6.) Ghadimi "owned 100% of all three companies," meaning he had "exclusive authority . . . to make major corporate decisions including whether to file for bankruptcy protection." (Doc. 12 at 7.) In April 2022, Ghadimi's companies were facing "extraordinary challenges" related to the COVID-19 pandemic. (Doc. 12 at 9.) Although not clearly alleged in the complaint, it appears the challenges included financial distress and, sometime prior to April 2022, SPG had defaulted on loans obtained from AZBT. (Doc. 27 at 2.)

In April 2022, "Ghadimi approached HonorHealth for emergency assistance," and HonorHealth "approved a $3 million advance." (Doc. 12 at 9.) The advance consisted of an initial payment of $1.2 million that was "explicitly restricted for physician salary payments." (Doc. 12 at 9.) The initial $1.2 million was "deposited into SPG's account at AZBT." (Doc. 12 at 9.) AZBT, however, "immediately seized the entire $1.2 million" to satisfy "unrelated loans." (Doc. 12 at 9-10.) Ghadimi contacted AZBT to complain the $1.2 million had been intended solely for physician salaries. (Doc. 12 at 10.) AZBT's attorney, Scott Cohen, told Ghadimi that if he "caused the companies to file bankruptcy and accept appointment of a trustee, AZBT would release the $1.2 million." (Doc. 12 at 10.) Based on that representation, Ghadimi "instructed attorney [Jonathan P.] Ibsen to file bankruptcy." (Doc. 12 at 10.) On April 19, 2022, Ibsen filed bankruptcy petitions on behalf of all three companies. (Doc. 12 at 10.)

Despite affirmatively alleging he instructed Ibsen to file bankruptcy petitions, Ghadimi also alleges "[t]he foundation of defendants' scheme rests on a fundamental fraud: no properly authorized bankruptcy petitions were ever filed for any of the three companies." (Doc. 12 at 7.) Ghadimi is adamant he "never authorized" the bankruptcy petitions, although there is no explanation how the petitions were unauthorized given

Ghadimi "instructed" counsel to file them. (Doc. 12 at 9.) Ghadimi may be referencing his argument that he "never saw the Petitions prior to filing," although it is not clear. (Doc. 12 at 8.)

After the bankruptcy petitions were filed, the bankruptcy court appointed defendant James E. Cross as bankruptcy trustee. According to Ghadimi, Cross immediately "discovered" the petitions had not been authorized but chose to conceal that "jurisdictional defect." (Doc. 12 at 8.) On May 2, 2022, Cross demanded Ghadimi execute "retroactive declarations of authority under threat of criminal prosecution." (Doc. 12 at 8.) Cross also "summoned Dr. Ghadimi to [a] conference room . . . and demanded he sign retroactive declarations of authority." (Doc. 12 at 8.) Ghadimi signed the petitions but alleges he did so "under duress." (Doc. 12 at 8.) Cross then "took an extraordinary step" of hiring Ibsen to serve as "trustee's counsel." (Doc. 12 at 8.) Ghadimi believes this hiring was for the nefarious purposes of creating a conflict and hiding behind attorney-client privilege. (Doc. 12 at 9.)

During the bankruptcy proceedings, "Cross repeatedly told the bankruptcy court and creditors that the businesses were 'hopelessly insolvent.'" (Doc. 12 at 11.) Those representations were false because Cross had "concealed multiple independent valuations and offers" showing the businesses were valuable. (Doc. 12 at 11.) In September 2022, Cross "crossed a bright line that no bankruptcy trustee should cross:" he provided a sworn declaration in litigation pending in California that accused Ghadimi of embezzlement and using company funds to support a lavish lifestyle. (Doc. 12 at 12.) The complaint does not explain the nature of the litigation in California, nor does it explain why it was so obviously improper for the bankruptcy trustee to offer evidence in that litigation.

Around the same time Cross submitted his declaration in California, Ghadimi requested one of his companies, UTC, be dismissed from the bankruptcy. (Doc. 12 at 13.) Ghadimi argued "UTC had no secured debt" and that it would be able to continue operations outside bankruptcy. (Doc. 12 at 13.) To counter Ghadimi's argument, Cross submitted a declaration from Dr. Omid Dilmaghanian stating UTC owed him $250,000.

(Doc. 12 at 13.) Ghadimi alleges that declaration was false because Dr. Dilmaghanian had "purchased convertible notes as an equity investment, not a loan." (Doc. 12 at 14.) Cross allegedly rewarded Dr. Dilmaghanian for his false declaration by transferring "SPG's valuable HonorHealth contracts and operations to a group that included Dilmaghanian." (Doc. 12 at 14.)

Beginning on an unidentified date in the summer of 2022, "Cross launched a public campaign to destroy Dr. Ghadimi's reputation through false allegations." (Doc. 12 at 16.) In "trustee reports distributed to creditors and media," Cross claimed Ghadimi had embezzled $22 million and defrauded physician investors. (Doc. 12 at 16.) Cross also violated Ghadimi's Fifth Amendment due process rights "through systematic exclusion from proceedings affecting his property interests." (Doc. 12 at 18.) Cross seems to have accomplished this by serving Ghadimi notices "at addresses he knew were incorrect." (Doc. 12 at 18.) Cross also deprived "the debtor entities of their right to counsel," apparently by hiring Ibsen. (Doc. 12 at 18.) And Cross engaged in a "pattern of intimidation and false statements" by attempting to have an employee "sign an affidavit against Dr. Ghadimi." (Doc. 12 at 19.) The complaint does not explain what this means.

At some point, defendant Cadles of West Virginia "acquired [AZBT's] position in certain loans and related rights." (Doc. 12 at 4.) Ghadimi alleges this assignment was void because he never signed "a personal guaranty," presumably with Cadles. (Doc. 12 at 19-20.) The complaint references, but does not explain, state-court litigation involving Cadles, Ghadimi, and his wife. (Doc. 12 at 19.) That litigation appears to be based on Cadles being the successor-in-interest to loans provided by AZBT. Cadles believed Ghadimi and his wife personally guaranteed those loans and, in 2022, filed suit in state court seeking to impose personal liability on them. Based on a review of the Superior Court docket, a bench trial was held on November 12 and 13, 2025. The state court later issued written findings concluding, among other things, that Ghadimi and his wife signed the personal guarantees at issue. Judgment was entered on February 24, 2026. *Arizona Bank & Trust v. Ghadimi*, CV-2022-005137 (Maricopa Cnty. Sup. Ct.).

- 4 -

In August 2025, months before the state-court litigation ended, Ghadimi filed this suit. At the same time he filed his original complaint, Ghadimi also moved for emergency injunctive relief. (Doc. 1, 2.) He then filed a variety of confusing documents, including multiple amended complaints. (Doc. 12, 17.) The court deemed the amended complaint filed on September 5, 2025, to be the operative complaint. (Doc. 34 at 7.) That complaint alleges eight claims against Cross, AZBT, and Cadles:

1) A *Bivens* claim against Cross;

2) "Civil conspiracy under Arizona law" against all defendants;

3) Violations of RICO against all defendants;

4) Breach of fiduciary duty against Cross;

5) Fraud and fraudulent inducement against Cross and AZBT;

6) Defamation per se against Cross;

7) Conversion against Cross and AZBT;

8) Declaratory relief against Cadles.

In late September 2025, Ghadimi and AZBT were discussing the viability of the complaint when AZBT informed Ghadimi it planned to move to dismiss based on the statutes of limitations allegedly barring most claims. Ghadimi and AZBT were unable to reach an agreement whether the claims were time-barred and, on October 3, 2025, Ghadimi filed a motion to amend his complaint. (Doc. 26.) Ghadimi argued the amended complaint would add "crucial tolling allegations that directly address [AZBT's] statute of limitations defense." (Doc. 26 at 1.) Ghadimi also argued his proposed amended complaint "streamlines [his] claims from eight to five." (Doc. 26 at 2.) The proposed amended complaint, however, still contains eight claims, so it is not clear which claims Ghadimi intended to delete. (Doc. 26-1.) AZBT filed its motion to dismiss that same day. (Doc. 26, 27.) While the motion to amend and AZBT's motion to dismiss were being briefed, the court denied Ghadimi's request for early injunctive relief. (Doc. 34.)

According to AZBT's motion to dismiss, all the claims against AZBT are untimely except for the civil RICO claim. For that claim, AZBT argued Ghadimi had not provided

sufficient factual allegations.

Cross later filed his own motion to dismiss, arguing the court lacked jurisdiction because Ghadimi did not receive permission from the bankruptcy court before filing claims against him. (Doc. 42.) Cadles also moved to dismiss, arguing it had not been properly served. (Doc. 57.) To the extent Ghadimi intended to include Cadles in the claims against AZBT, Cadles incorporated the arguments for dismissal made by AZBT. (Doc. 57.) Finally, in connection with each motion to dismiss Ghadimi filed a motion to file a sur-reply. (Docs. 48, 52, 61.)

## ANALYSIS

A preliminary obstacle to resolving the pending motions is that Ghadimi used artificial intelligence in drafting most, if not all, of his filings. In an order issued on October 15, 2025, the court noted that Ghadimi may have used artificial intelligence in drafting an early filing because he had cited non-existent cases. The court warned Ghadimi that he may be subject to sanctions if he submitted inaccurate filings in the future. (Doc. 34 at 7.) Ghadimi did not heed that warning.

Ghadimi's use of artificial intelligence has resulted in his many filings being unusually difficult to understand. The filings often present lengthy but irrelevant arguments or make factual assertions Ghadimi would not have made if he were drafting the documents himself. For example, at one point his opposition to AZBT's motion to dismiss refers to AZBT "voluntarily removing this case from state court," and then argues the court has personal jurisdiction over AZBT based on AZBT's contacts with Arizona. (Doc. 44 at 11.) The case was not removed from state court and AZBT did not make any personal jurisdiction arguments. As the party who filed this suit directly in federal court, Ghadimi must have known it had not been removed. In addition, there is no explanation why Ghadimi would embark on a lengthy detour regarding personal jurisdiction when that issue was not argued.

Ghadimi's filings also cite obscure cases for incorrect legal propositions. For example, his opposition to AZBT's motion to dismiss includes the following statement:

> The Ninth Circuit recognizes that orders entered without notice or procured through concealment cannot bar independent civil-rights or RICO claims. *In re Castillo*, 297 F.3d 940, 947 (9th Cir. 2002).

(Doc. 44 at 8.) That case holds effectively the opposite of what Ghadimi claims. According to *In re Castillo*, even when a plaintiff obtains permission to sue a bankruptcy trustee, claims based on the failure to provide notice are barred by "quasi-judicial immunity." *Id.* at 954. That case does not contain any reasoning that would support Ghadimi's assertion.[1]

Ghadimi's reliance on artificial intelligence required the court spend an inordinate amount of time attempting to decipher his filings. The following analysis is an attempt to make sense of them, but much of what Ghadimi has argued is ignored because it is not relevant to the issues presently being litigated.[2]

## I.    Claims Against Cross

Ghadimi alleges seven claims against Cross: a *Bivens* claim, civil conspiracy, civil RICO, breach of fiduciary duty, fraud and fraudulent inducement, defamation, and conversion. Cross seeks dismissal of all these claims based on the "*Barton* doctrine" and Ghadimi's undisputed failure to obtain permission from the bankruptcy court before suing Cross. (*See generally* Doc. 42 (citing *Barton v. Barbour*, 104 U.S. 126 (1881)).)

The *Barton* doctrine "provides that, before suit can be brought against a court-appointed receiver, leave of the court by which he was appointed must be obtained." *In re Crown Vantage, Inc.*, 421 F.3d 963, 970–71 (9th Cir. 2005) (simplified). In the bankruptcy context, this doctrine means "a party must first obtain leave of the bankruptcy court before it initiates an action in another forum against a bankruptcy trustee or other officer appointed by the bankruptcy court for acts done in the officer's official capacity." *Id.* at 970. "A district court is considered to be 'another forum,' requiring leave of the bankruptcy court before a lawsuit can be brought." *In re Yellowstone Mountain Club, LLC*, 841 F.3d 1090,

---

[1] Ghadimi also cites *In re Castillo* as using the phrase "colorable authority." (Doc. 44 at 10.) That phrase does not appear in the case.
[2] Ghadimi requested leave to file sur-replies opposing each of the motions to dismiss, arguing he needed to address new issues raised in defendants' replies. (Docs. 48, 52, 61.) That does not appear to be correct. But nonetheless, Ghadimi's motions are granted, the court has considered the sur-replies, and they do not impact the analysis.

1094 (9th Cir. 2016).

Under the *Barton* doctrine, Ghadimi needed permission from the bankruptcy court to pursue any claims against Cross based on Cross's official acts. Although it is difficult to pin down every wrongful act Ghadimi attributes to Cross, the actions identified in the complaint include the following: Cross coerced Ghadimi to "sign retroactive declarations of authority" (Doc. 12 at 8); Cross made representations to the bankruptcy court and creditors regarding the businesses financial conditions (Doc. 12 at 11); Cross made representations in a California court in his capacity as the bankruptcy trustee (Doc. 1-1 at 115-18); Cross submitted evidence to the bankruptcy court regarding UTC's debts (Doc. 12 at 13); Cross committed "wire fraud" by filing "false bankruptcy petitions" (Doc. 12 at 15); Cross distributed "trustee reports" containing false allegations (Doc. 12 at 16); Cross served notices regarding the bankruptcy proceedings at an incorrect address (Doc. 12 at 18); and Cross improperly seized some of Ghadimi's property claiming it was part of the bankruptcy (Doc. 12 at 18).

All of these actions are ones bankruptcy trustees take in their official capacity. "Generally, the trustee is to gather and liquidate the property of the estate, to be accountable for the estate, ensure that the debtor performs his or her obligations, investigate the finances of the debtor, review the proofs of claim, and where appropriate, oppose the debtor's discharge . . . The trustee also must prepare the final report and an accounting for the administration of the estate." *In re Castillo*, 297 F.3d at 950–51. The actions for which Ghadimi wishes to sue Cross plainly count as duties undertaken in his capacity as trustee. Because these acts easily qualify as official acts, Ghadimi needed permission from the bankruptcy court before filing here.

Ghadimi argues the *Barton* doctrine "does not apply to ultra vires acts, fraud, or conduct in defiance of fiduciary duties." (Doc. 49 at 7.) In support, he cites *In re Yellowstone Mountain Club, LLC*, 841 F.3d at 1095, and *Leonard v. Vrooman*, 383 F.2d 556, 560 (9th Cir. 1967). These cases undermine (rather than support) Ghadimi's argument.

*In re Yellowstone* addressed the scope of the *Barton* doctrine and concluded a party

"needed the bankruptcy court's permission before bringing [certain] claims," including a claim for breach of fiduciary duty. 841 F.3d at 1096 n.2. Ghadimi's assertion that the *Barton* doctrine does not apply to claims for breach of fiduciary duty is incorrect. As for *Leonard*, its holding is exceptionally limited. As explained by another court, *Leonard* holds that "where a trustee, without prior court approval, enters and changes the locks on a building that is neither listed as an asset of the estate, nor is in fact an asset of the estate by virtue of being owned by a third party, the bankruptcy court lacks jurisdiction to enjoin a suit by the third-party building owner against the trustee from proceeding to a forum with proper jurisdiction over the matter." *In re J & S Props., LLC*, 545 B.R. 91, 110 (Bankr. W.D. Pa. 2015). Cross is not alleged to have engaged in any remotely similar conduct as to non-estate assets that would allow Ghadimi to rely on *Leonard*.

Although the bulk of Ghadimi's opposition indicates he disagrees that permission was needed, he also explicitly concedes the opposite. There is a very limited exception to the *Barton* doctrine that allows suits to proceed without permission from the bankruptcy court if the claims are based on a trustee's "acts in carrying on business." 11 U.S.C. § 959(a). This "limited exception applies only if the trustee . . . is actually operating the business" involved in the bankruptcy. *In re Crown Vantage, Inc.*, 421 F.3d at 972. Ghadimi's opposition references this exception and then states "Cross's conduct did not involve carrying on business but administration and liquidation, which requires court leave." (Doc. 49 at 8.) That is, Ghadimi agrees Cross's acts were "administration and liquidation" such that leave from the bankruptcy court was needed. It is undisputed Ghadimi did not obtain such leave: in fact, he filed a motion with the bankruptcy court seeking permission to bring these claims (Doc. 49 at 73), but initiated this case before the bankruptcy court ruled (Doc. 50 at 1 n.1). All claims against Cross are dismissed for lack of subject matter jurisdiction.

## II.    Claims Against AZBT

The operative complaint alleges four claims against AZBT: civil conspiracy, RICO, fraud and fraudulent inducement, and conversion. AZBT's motion to dismiss presents three

arguments. First, all of Ghadimi's claims against AZBT involve "issues that were or could have been raised and resolved in the Bankruptcy Case." (Doc. 27 at 4.) Because of that, AZBT argues Ghadimi's claims are barred by res judicata. Second, AZBT argues the civil conspiracy, fraud and fraudulent inducement, and conversion claims are barred by the applicable statutes of limitations. And third, AZBT argues Ghadimi's RICO claim is not supported by sufficient factual allegations.

Ghadimi's opposition to AZBT's motion is almost entirely non-responsive. He does not present any coherent argument regarding res judicata. Instead, he focuses on the timeliness of his claims, but devotes most of his time to arguing the RICO claim is not time-barred. (Doc. 44 at 4-6.) AZBT did not argue the RICO claim was untimely. The opposition also argues "judicial estoppel" precludes dismissal, although Ghadimi's argument on this point is incomprehensible. (Doc. 44 at 6-7.) Because the other claims are barred by the statutes of limitations, RICO is the only one the court need substantively address.[3]

### A. Fraud and Fraudulent Inducement, Conversion, and Civil Conspiracy

Ghadimi's three tort claims are brought under Arizona law. In Arizona, fraud claims are subject to a three-year statute of limitations. A.R.S. § 12-543. Conversion claims are subject to a two-year statute of limitations. A.R.S. § 12-542(5). And "[t]he applicable statute of limitations for a civil conspiracy claim is the statute of limitations for the underlying claim." *Johnson v. Am.'s Wholesale Lender*, No. CV-14-00201-PHX-SRB, 2014 WL 12550550, at *3 (D. Ariz. Apr. 3, 2014) (simplified). Because the civil conspiracy claim is based on fraud and conversion, there is at most a three-year statute of limitations. *Cf. Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir.

---

[3] Ghadimi's claims appear to be barred by res judicata. That doctrine operates in bankruptcy to "bar[] all grounds for recovery that could have been asserted, whether they were or not, in a prior suit between the same parties on the same cause of action." *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 528–29 (9th Cir. 1998) (simplified). Ghadimi bases some or all of his claims on acts that occurred during the bankruptcy proceedings and that could have been litigated there. Ghadimi therefore should have litigated those claims in the bankruptcy court and, having failed to do so, is likely barred from litigating them here. But neither AZBT nor Cadles identify the final judgment issued by the bankruptcy court and there continue to be filings in the bankruptcy case. The court therefore does not definitively resolve whether res judicata bars all claims.

2011) ("Under Arizona law, a claim of civil conspiracy must be based on an underlying tort . . . .").

The primary act underlying the fraud and fraudulent inducement, conversion, and civil conspiracy claims against AZBT occurred in April 2022 when AZBT "falsely represented . . . that if Dr. Ghadimi agreed to file bankruptcy . . . the $1.2 million in seized physician payroll funds would be released." (Doc. 12 at 29.) Ghadimi knew almost immediately that representation was false because the funds were not "returned to their intended purpose" and instead used "as leverage to extract releases and enhanced liens." (Doc. 12 at 32.) In other words, in approximately April 2022 Ghadimi knew he had been injured and who had caused his injury. That knowledge means his tort claims accrued at that time. *Albano v. Shea Homes Ltd. P'ship*, 254 P.3d 360, 366 (Ariz. 2011) (statutes of limitations "begin to run after an injury occurs and is (or reasonably should have been) discovered").

This suit was not filed until August 2025, well over three years after Ghadimi's claims accrued. (Doc. 1.) Even the longer three-year statute of limitations for fraud is not long enough to permit the tort claims. The state-law tort claims against AZBT are dismissed.

### B. Civil RICO

The remaining claim against AZBT is a civil RICO claim. To state such a claim, Ghadimi needed allegations establishing five elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996); *see also* 18 U.S.C. § 1961 *et seq.* These predicate acts include acts chargeable under certain state criminal laws; acts indictable under certain federal criminal laws; and any bankruptcy, securities fraud, or drug-related activity which is punishable under federal law. *See* U.S.C. §§ 1961-1962. AZBT argues Ghadimi has not sufficiently alleged a RICO claim because he did not "identify sufficient indictable racketeering activity," and failed to allege "a pattern of racketeering activity." (Doc. 27 at 7-8.) The court need only address

the second argument.

The "pattern" element requires a plaintiff identify "two or more predicate crimes within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 613 (2025) (simplified). This requires a showing of "continuity," defined as either "a closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). Ghadimi's complaint does not allege sufficient facts showing the alleged pattern involving AZBT is ongoing "with a threat of repetition." *Id.* So the only possibility is Ghadimi intended to allege a "closed period of repeated conduct." *Id.*

There is no "hard and fast, bright line" rule for how long a closed period must be. *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995). But "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J.*, 492 U.S. at 242. Ghadimi's alleged predicate acts occurred between April and September 2022.[4] This "pattern of activity lasting only a few months does not reflect the 'long term criminal conduct' to which RICO was intended to apply." *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 (9th Cir. 1992) (pattern lasted six months); *see also Kan-Di-Ki, LLC v. Sorenson*, 723 F. App'x 432, 434 (9th Cir. 2018) ("fraud scheme that last ten months" was "too limited and short in duration to sufficiently establish closed-ended continuity"); *Ward v. Kroger Co.*, 372 F. App'x 738, 740 (9th Cir. 2010) (five months too short). Ghadimi has not alleged a plausible civil RICO claim.

### III.    Claims Against Cadles

Ghadimi appears to believe AZBT and Cadles should be treated as the same entity, although it is hard to understand why that would be so. The complaint alleges Cadles "acquired [AZBT's] position in certain loans and related rights through assignment." (Doc.

---

[4] The complaint references events outside this period, but Ghadimi only identified acts from April 2022 to September 2022 when identifying the predicate acts. (Doc. 12 at 27.) In addition, Ghadimi's opposition to the motion to dismiss argues the predicate acts are "continuing . . . through unauthorized petitions and concealment of business value." (Doc. 44 at 6.) But it is not clear what this means because the filing of the bankruptcy petitions and alleged concealment of value allegedly occurred between April and September 2022.

12 at 4.) It also alleges "Cadles is successor to AZBT for purposes of the transaction and claims alleged" in the complaint. (Doc. 12 at 4.) But there is no explanation why both AZBT and Cadles would, for example, be responsible for actions taken by AZBT in April 2022.

Setting aside Ghadimi's lack of a factual basis for conflating the two entities, he wishes to assert against Cadles some or possibly all of the claims he asserted against AZBT. To the extent that is Ghadimi's intent, the state tort claims brought against Cadles fail for the same reasons they fail against AZBT. The other claims against Cadles are civil RICO and declaratory judgment. Ghadimi does not include the basis for these claims in his complaint—again, his RICO predicates list only actions by Cross and AZBT (Docs. 12 at 26-27, 26-1 at 30-31)—but his opposition to the motion to dismiss suggests both claims are based on Cadles's conduct in state-court litigation in 2025 (Doc. 58 at 3-4, 11).

Cadles's motion to dismiss argues it was not properly served.[5] (Doc. 57.) According to Cadles, it is a West Virginia limited liability company "that does not have a Statutory Agent in the state of Arizona." (Doc. 57 at 3.) Despite that, Ghadimi filed a notice of service claiming Cadles had been served via its statutory agent at the Arizona Corporation Commission ("ACC"). (Doc. 21; Doc. 57 at 2). Cadles argues service on the ACC was not valid and Ghadimi does not argue otherwise. Instead, Ghadimi's opposition claims he should be allowed to cure any service defect. (Doc. 58 at 6-8.)

"Once service is challenged, plaintiffs bear the burden of establishing that service was valid under Rule 4." *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004). Here, Ghadimi has not carried his burden of proof that service was proper. The only question therefore is whether the court should dismiss or quash the service and allow Ghadimi to try again. *S.J. v. Issaquah Sch. Dist. No. 411*, 470 F.3d 1288, 1293 (9th Cir. 2006) (the district court has discretion to dismiss an action or to quash service"). Dismissal is appropriate because realleging the two remaining claims against Cadles would be futile.

Ghadimi seeks a judgment "that no valid personal guaranty exists" for Cadles to

---

[5] The motion also sought to quash the application for entry of default. Because dismissal is appropriate, there is no need to formally quash the application for entry of default.

enforce. (Doc. 12 at 33.) This is a reference to the state-court litigation which the complaint itself alleges focuses on the existence of a personal guaranty. (Doc. 12 at 33.) To the extent the court can understand this claim for relief, Ghadimi appears to be hoping to litigate the validity of a personal guaranty in this court while the same issue is litigated in state court. Ghadimi also appears to use state-court litigation as a basis for his civil RICO claim. (Doc. 58 at 11.)

That state-court litigation recently resulted in a judgment against Ghadimi and his wife. If the court were to allow Ghadimi to properly serve Cadles, it is virtually certain Cadles would respond to the complaint by arguing, among other possible defenses, that the court should not hear these claims pending final resolution of the state-court proceedings. *See Nakash v. Marciano*, 882 F.2d 1411, 1416-17 (9th Cir. 1989) (affirming *Colorado River* abstention in civil RICO case that was "not identical," but "substantially similar" to state-court proceedings). It would be futile to allow Ghadimi to cure the lack of service because such a motion would be granted. *Ouellette v. Special Recreation Servs., Inc.*, No. 320CV00391RCJWGC, 2021 WL 796140, at *2 (D. Nev. Mar. 2, 2021) ("The *Colorado River* doctrine may be raised by the Court sua sponte.").

"Generally the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 841 (9th Cir. 2017) (simplified). But when there are "exceptional circumstances . . . serv[ing] an important countervailing interest," a district court may opt to abstain if the "*Colorado River* factors" support doing so. *Id.* at 839 (discussing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)). Those factors include:

> (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.

- 14 -

*Id.* at 841–42 (simplified). The factors must be examined "in a pragmatic, flexible manner with a view to the realities of the case at hand." *Id.* at 842 (simplified).

There is no property at issue and the federal forum would not be inconvenient, so the first two factors support exercising jurisdiction. The third factor—avoiding piecemeal litigation—weighs strongly in favor of abstaining. "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *Montanore Mins. Corp. v. Bakie*, 867 F.3d 1160, 1167 (9th Cir. 2017) (simplified). The state-court litigation appears to overlap extensively with Ghadimi's civil RICO and declaratory judgment claims against Cadles.

The fourth factor regarding the order in which the forums obtained jurisdiction also supports abstaining. This case was filed in 2025, three years after the state-court litigation. In addition, this factor requires assessing "the relative progress of the state and federal proceedings." *Id.* at 1168. In state court, trial litigation has ended while the current case has not proceeded past its earliest phase. The fourth factor therefore weighs heavily in favor of abstaining.

The fifth factor looks to whether federal or state law will provide the rule of decision. Federal law applies to the civil RICO claim while Arizona law applies to the contract dispute. Because the contract dispute case does not involve complicated issues of state law, this factor could support exercising jurisdiction. *Id.* But allowing a civil RICO claim to proceed on litigation activities in state court is "disfavored" unless the facts approach sham litigation, *Sosa v. DIRECTV, Inc.,* 437 F.3d 923, 939-40 (9th Cir. 2006), and Ghadimi would be hard-pressed to make that showing given that Cadles prevailed.

The sixth factor, whether the state court proceedings can adequately protect Ghadimi's rights as a federal litigant, supports abstaining because Arizona courts have the "authority to address the rights and remedies at issue." *Id.* at 1169 (simplified). The seventh factor looks to whether Ghadimi "attempted to forum shop by filing in federal court." *Id.* Ghadimi obviously did so, choosing to file this suit three years after the state-court litigation began. *See Nakash*, 882 F.2d at 1417 ("[A]fter three and one-half years, [plaintiff]

has become dissatisfied with the state court and now seeks a new forum for their claims. We have no interest in encouraging this practice."). And the eighth factor looks to "whether the state court proceeding sufficiently parallels the federal proceeding in order to ensure comprehensive disposition of litigation." *Id.* at 1170. The state-court proceeding is almost an exact parallel of Ghadimi's declaratory judgment claim against Cadles and involves the validity of certain actions Ghadimi identifies as predicate acts for purposes of his RICO claim. Resolution of the state-court proceeding will preclude any further litigation of Ghadimi's civil RICO and declaratory judgment claims.

On balance, the factors establish there are exceptional circumstances meriting abstention in favor of the state-court proceeding. "The state court first assumed jurisdiction over" claims involving the alleged personal guaranty; "proceeding with the federal case present[s] a risk of piecemeal litigation; the state court had jurisdiction over the case for several years, and ha[s] made substantial progress, by the time the federal proceeding was filed; state law provides the rule of decision on the merits . . .; the state court can adequately protect the federal rights at issue; [Ghadimi's] actions strongly suggest that [he] was forum shopping by filing in federal court; and the suits are sufficiently parallel for *Colorado River* to apply." *Id.* at 1170-71. Because the court would abstain from hearing the remaining claims against Cadles if Ghadimi cured his failure to serve, it would be futile to allow him to do so.

### IV. No Leave to Amend

Ghadimi cannot proceed against Cross without first obtaining permission from the bankruptcy court, meaning it would be futile to allow Ghadimi to amend his complaint against Cross. The claims against Cross are dismissed without prejudice.[6] It would be futile to allow Ghadimi to amend his state tort claims, which are time-barred. *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1046 (9th Cir. 2011). The civil RICO claim

---

[6] Cross argues the claims should be dismissed "with prejudice." (Doc. 42 at 12.) The *Barton* doctrine is jurisdictional. *In re Crown Vantage, Inc.*, 421 F.3d at 971 n.5. And "[d]ismissals for lack of subject-matter jurisdiction . . . must be without prejudice." *Hampton v. Pac. Inv. Mgmt. Co. LLC*, 869 F.3d 844, 846 (9th Cir. 2017). Cross also requests an award of attorneys' fees. (Doc. 42 at 12.) To the extent Cross believes he is entitled to fees, he may file a motion in compliance with the Local Rules.

is not time-barred, but the relevant actions did not cover a long enough time such that Ghadimi would be able to state a plausible civil RICO claim against AZBT. Leave to amend that claim is also denied. Finally, it would be futile to allow Ghadimi to cure his service error regarding Cadles because his civil RICO and declaratory judgment claims would not proceed in federal court at this time.

Accordingly,

**IT IS ORDERED** the Motions to Dismiss (Doc. 27, 42, 57) are **GRANTED**. The claims against defendant James Cross are **DISMISSED WITHOUT PREJUDICE**. All claims against defendants Arizona Bank and Trust are **DISMISSED WITH PREJUDICE**. The state tort claims against defendant Cadles of West Virginia are **DISMISSED WITH PREJUDICE**. The declaratory judgment act claim and civil RICO claim against Cadles are **DISMISSED WITHOUT PREJUDICE**. The Clerk of Court shall enter judgment and close this case.

**IT IS FURTHER ORDERED** the Motion to Amend (Doc. 26) and Motions to File Sur-Replies (Doc. 48, 52, 61) are **GRANTED**.

Dated this 10th day of March, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**

- 17 -